This is Local 193, International Brotherhood of Electrical Workers v. City of Springfield. For the appellant, Mr. Sanger, for the appellate, Ms. Johnson, you may proceed. Good afternoon, your honors, I'm Jim Sanger, appearing on behalf of the appellant, Local 193, International Brotherhood of Electrical Workers. This case is on appeal from a dismissal of the Circuit Court of Sangamon County of Local 193's petition to compel arbitration over a grievance that covered a temporary layoff which Local 193 believed violated a promise of full-time employment and where the labor agreement had a broad-based agreement to arbitrate. The facts in the case are really not in dispute. Local 193 has been the collective bargaining representative of the employees who operate and maintain the electric power system here in the City of Springfield that's operated by the City for decades, going back to at least the late 1930s. And the union and the city were parties and remain parties to a four-year collective bargaining agreement that started in October of 2007 and is not expiring until September of this year. Early in 2010, the city came to the union and asked that the labor agreement be reopened. And the city presented the union with a document called a Memorandum of Understanding, a party important issues were that the city wanted the right during the next fiscal year, which was set to start on March 1st of 2010, to have the employees take 12 unpaid furlough days. And in addition, they wanted the wage increases that were scheduled under the labor agreement to be waived. The city attempted to justify these concessions because they needed to adjust a labor cost line item in their upcoming budget. Now, the union took its responsibilities very seriously. The city's argument basically made no sense to the union. And the union concluded it could not explain to its members why they should reopen the labor agreement. And the union decided not to submit the MOU to its members for a vote. When the city learned that the union would not submit the MOU for a vote, the city initiated on February 26, 2010, on the eve of this new fiscal year, a layoff of 58 employees for 30 days, which the city told the union was the economic equivalent of the 12 furlough days for everyone and the waived raises. After the layoffs were announced, the 58 union members and the union itself filed grievances over these layoffs. The city's response was that the layoffs were for, quote, lack of funds. And that because the layoffs were for lack of funds, the grievances would not be processed and would not be submitted to arbitration. We believe that the circuit court, in denying our petition, did a real injustice to the language in the labor agreement that we'd like to review with you. The first point is that Article 2, Section 1 of the labor agreement, defines a grievance very broadly. A grievance for purposes of this agreement shall mean a complaint or dispute between the parties on any term and condition of employment and the meaning, interpretation, or application of the agreement. There are no exceptions. And interestingly, there's two sections in this Article 2. Section 1 deals with grievances initiated by the union and Section 2 deals with grievances initiated by employees. And this becomes important shortly because the city argued that language that they thought limited employee filed grievances also limited union filed grievances. Article 3 of the labor agreement has the agreement to arbitrate. It is very simple and it's very comprehensive. If the representatives of the employer and the local union are unable to resolve the grievance, then the grievance may be referred to arbitration in accordance with the procedures outlined below. No exceptions. We would next point out to the court that the primary substantive provision of the labor agreement that the union was relying upon is Article 4, Section 1 of the agreement, which states, all regular employees covered by this agreement shall receive full-time employment, provided that they are ready and in condition to perform their work in accordance with the terms set forth in the agreement. Employees laid off because a job is completed or shut down for reasons beyond the city's control during any month shall be paid in full to date of layoff. And the union believed that this section protected the employees from a temporary layoff for reasons related to the city having to adjust a budget line item. The city relied primarily on Article 23, Section 1, which we ask that the court pay very close attention to for what it says and what it doesn't say. This article reads, the employer has the right to employ layoff, discharge and promote employees in accordance with the provisions of this agreement. It's not a broad, you know, it's qualified. You have to comply with all the other provisions. And then the second sentence is very important to them. However, any employee laid off for any reason other than lack of work or lack of funds may file a grievance pursuant to the procedures outlined in this agreement. And the layoff or discharge shall be processed in accordance with the grievance procedure. Now, what does the language say and not say? Well, first it says absolutely nothing about the union's right to file a grievance, which the circuit court said it had waived. And we submit to you that when you look at the proviso in the first sentence that everything was preserved by that article and the fact that there were two separate sections in Article 2, one for union filed grievances and one for employee filed grievances, made absolutely no sense for the circuit court to read that sentence as waiving the union's right to file a grievance. Second, the language in Article 23, Section 1, preserves the promise of full-time employment. It doesn't negate it, and that's through that subject to all provisions in the agreement. It's quite a leap to say that that sentence made the promise of full-time employment completely unenforceable, which is where we are with the circuit's court opinion. We have a right, but we cannot enforce it. The third problem with the court's ruling on this article is that the parties have a fundamental disagreement about what lack of funds means. The city's view is that it has an unreviewable discretion to define the term lack of funds and then apply it. And in this case, because they needed to adjust a future budget line item, that was the justification for the lack of funds. And we think that reading of the contract just makes absolutely no sense. For a couple of reasons. The budgetary process is by its nature projecting assumptions into the future. That's what you do when you budget. And the problem that we all know is that the future is completely unpredictable. And when you budget, you can be wrong, and frequently the city has been wrong. And the second thing is that these budgets are governed by these accounting rules that are arcane, complex, and give the budgeting authority different options on how they're going to treat different expense items. And so that the budgeting process really has nothing to do with what's going on, what's really going on with the business entity. The artificiality of what the city had presented to the union appeared on the face of the MOU itself. The city told the union they had to have 12 days. When you look at the MOU, it says, well, you're giving up 12 days, but if the finance is approved by mid-year, it's only six days, and plus we're going to give you two more paid days in the next fiscal year. Well, how could the union go to its membership and in good faith say the city's got to have this relief because of a lack of funds where they're getting these mixed messages on the very document that the members are being asked to vote on? And, Your Honors, I bring this up, and I ask you to take judicial notice of this, that the city, as a public body in Illinois, had to publish on their website the 2011 year after it closed. And that year, which was budgeted when this dispute arose, the city made a $24 million error on expenses in the electrical fund, the very fund that they said they had to balance. They overstated their expenses by $24 million. I don't see how that is relevant to the issues we have before us. I can understand. It certainly shows that the union was right to be suspicious about it. Well, what is your position on who determines the definition of lack of funds? It is to be decided by an arbitrator, Your Honor. Of all the cases, Your Honors, that are cited in our brief and their brief and by the court, the closest ones in terms of a holding is, interestingly enough, there was a landmark United States Supreme Court decision in the AT&T case, which is cited, I think, by both of us, which basically stands for the proposition that the courts determine if there is an agreement to arbitrate, which we think is a pretty simple determination in our case. But when that case got remanded back to the district court, the district court was faced with language of lack of work. It was as close as we could get. The AT&T said that the union was saying that there couldn't be layoffs if there was a lack of work outside the area covered by the labor agreement. And AT&T said the arbitrator had no authority to decide that question. And the district court said, no, it is a disputed contract term. That is to be decided by the arbitrator. And, again, that was the closest holding that I could find for Your Honors, one way or the other. But what was arbitrable? Whether there was a lack of work or whether there was it was arbitrable whether lack of work applied only within the terms of the contract? What AT&T disputed was that the arbitrator didn't have authority to interpret that clause to expand it the way the union was To work that was outside. So we've been over the city's view of what lack of work means. We, the union, have a much more limited role. We think lack of work, I'm sorry, lack of funds is its common sense meaning, which is that the city can't pay its bills when they come due or it's getting close to that. It's a cash crunch. And the city never contended that that was the situation they were facing. And, in any event, a lack of funds is not an exception to the article for Section 1 promise of full-time employment. Finally, even on the issue of employee filed grievances, which I think is their strongest argument, we don't think that the language in Article 23 rises to the level of a waiver because in labor relations the standard is a clear and unequivocal waiver. And what it says is to get there you have to infer from the language. And we just don't think that was, you shouldn't be doing that in at least labor relations. The court also relied on Article 21, Section 1, which was the General Management Rights Clause, which referred to the city's authority over its budget. But twice in that article the other provisions of the labor agreement were preserved. So it can't be read as negating and making unenforceable Article 4, Section 1. In addition to misreading the labor agreement, with all due respect to the circuit court, we also believe that the circuit court didn't apply black-letter law principles that are applicable here. First, the Illinois Uniform Arbitration Act is the legal statutory basis for this lawsuit. And it states that the circuit courts are not to be deciding the merits of the grievance. And when the circuit court said that the city has the management right to lay off and to plan its budget and to have to arbitrate would interfere with that management right, that is their defense. If you order us to arbitration, that is their defense. And so the court went and we honestly had no idea that the circuit court was going to delve into the merits of the case. We thought this, we were maybe overconfident. We thought this was a much more simpler case than the circuit court saw it. And we did not brief the merits of the grievance before the circuit court. We didn't think we were supposed to. Another black-letter law provision that we think is applicable is the Illinois Public Labor Relations Act, which regulates the labor relations between public employers and labor unions here in the state of Illinois. And that requires that a collective bargaining agreement that have broad-worded grievance and arbitration provisions almost tracks the type of broad agreement that we have here. And so things are covered unless the statute says there is a mutual agreement otherwise. And we think that when you really look at Article 23, Section 1, there isn't the mutuality to exclude a grievance trying to enforce this promise of full-time employment. The primary case that the circuit court relied on was the city of Rockford case, which I think both sides cited for dicta because it has a pretty nice explanation of the law. But the holding in the city of Rockford was very unusual. It was very unusual facts. It was the union was trying to compel the public employer through the arbitration to provide workers' compensation insurance for a police officer who had been injured off-duty. Nothing to do with the employment relationship covered by the labor union. And the court in that case said that that was beyond the scope of that arbitration provision. And to use that case, which is so odd and so completely different from us, as the holding against us, I just think the court, I don't know if the court really looked at the holding. Counsel, if the individuals in the class action are barred from arbitration, what would the practical effect of allowing the union to arbitrate be? None. It's just I didn't want to give it up without a fight. I really think it would be wrong for even them to be barred. But no, it would have no practical effect. The city has argued, and they cite a group of non-labor relations association cases, that the union doesn't have standing to enforce the agreement to arbitrate. I mean, that's just such a mess. When you look at the two Illinois statutes, the Uniform Arbitration Act, the Public Labor Relations Act, you look at our contract, for the city to say that we can't enforce the agreement is really unsupportive. I see the red light. We'll have time to get on with that. Ms. Joneson? May it please the court, Mr. Singer? We can talk about statutes and case law and presumptions, but actually this case is quite a bit simpler than that. It takes me back to really my first year of law school and looking at those foreign contracts. I remember my contracts professor always saying, what did the parties bargain for? Look at the language. See what the intent of the parties is. And this contract seems pretty simple. Mr. Singer read this language, but I think it bears repeating. Any employee laid off or discharged for any reasons other than lack of work or lack of funds may file a grievance. It's that simple. Now I remember from contracts that specific provisions apply over general provisions. So we can look at the definition of a grievance and we can look at the Management Rights Clause. This is obviously much more specific. This is found in Article 23, the section, one paragraph, layoff. But who decides whether the city has a legitimate lack of funds? Well, the union bargained that away. Any other reason for layoff, they can absolutely file a grievance and proceed to arbitration if necessary. But this specifically excludes, and really because it goes hand-in-hand with the Management Rights Clause because the city has the ability to determine its budget. I don't think it's realistic to say the city has to. So if the city lays off because the city says it has a lack of funds, that's the end of the game, end of the story. There's no review of that decision by the city. That is correct. This is an issue of substantive arbitrability. And the case law is clear, even the House and Case, cited by Mr. Singer, U.S. Supreme Court case, distinguishes between procedural arbitrability questions and substantive. This is clearly a substantive, it's a hard word to say, arbitrability question. It is for lack of funds. It's clear, according to the record, that discussions with the parties on the city's anticipated budget shortfalls started sometime in January preceding the budget year. There was a lot of exchange of emails back and forth that are documented in the record. And the layoffs occurred due to lack of funds. And quite simply, that is what the parties bargained in this agreement. Now we can, you know, dissect the circuit court's decision in this. It's here on review from summary judgment. So the court's review is de novo. So obviously the court can affirm for any reason found in this. When you say it was bargained away, it's something then that could be bargained for. I mean, in the sense that this could have said, and lack of work or lack of funds shall be determined by. Absolutely. An additional hearing or an arbitration process. Absolutely. Very simply, the parties could have agreed to language that said any employee laid off or discharged may file a grievance and excluded the lack of work or lack of funds exception. But the plain language of the contract. How about the case counsel cited? I forgot the name of it, but he said that it indicated disputed contract terms must be decided by an arbitrator. And I'm prepared to discuss that case, Render. The key in that case, again, turned on the specific language of the labor agreement. And the clause in question in the AT&T case is far different than the language that we have here. That language said, it had a general management rights clause that is found in most collective bargaining agreements. But the specific provision regarding lack of work, it just allowed the employer to lay off, when lack of work necessitates layoff, employees shall be laid off in accordance with the terms of employment and in layoff groups as set forth. Then the general provision indicated that AT&T is free to exercise certain management rights, including the hiring and placement of employees. There was no specific provision here, like we have in the agreement before us, that specifically called out an employee does not have a right to file a grievance over lack of work or, in this case, lack of funds. This language really couldn't be much clearer as far as I'm concerned. And because of this very specific provision, that is ultimately what the circuit court relied on in excluding finding that this is not subject to arbitration. And that consideration, since it's one of substantive arbitrability, is one for the court to decide, not an arbitrator. If there are no further questions, we're done. Thank you. No, thank you. Rebuttal? Well, I was going to try to find a page for it in the record, but I would ask that Your Honors look at Article 2, Section 1 and 2 of the Labor Amendment. Section 1 talks about union-filed grievances. Section 2, employee-filed grievances. It is entirely reasonable. Why it could have been, as the court and counsel were saying, it could have said the employees and the union can, and then as Article 23, Section 1 goes on. But with a labor agreement that specifically talks about union-filed grievances, how can the court say that when the parties chose to say an employee, they also meant the union, when they had been very explicit that there are two different routes for a grievance to be filed. In fact, I think it supports us, obviously, because by excluding the union, we think it shows that there was no intent to cover the union-filed grievances. And we submit to you that that is a sensible... By the way, those sections appear in the record at C9 and C10. That is a very sensible reading of the labor agreement. On a lack of funds layoff, the city would come to the union and say, here's our problem. We'd like to do this layoff. The union then sees all this material, and the union can decide... The union has an interest in the city being a viable employer. The union can take that into account and decide whether they want to agree with what the city is proposing. The rank-and-file employees would not have access to the information. And it might have well been that the parties did not want individual employees challenging a decision that had been reached between the union and the city. If you decide that the employees don't have the right... The problem in our view with the city's argument, what the circuit court did is, it didn't read the words of the contract, and it didn't read the contract as a whole, which we think are really basic... Obviously, basic provisions of contract construction. I did want to mention, Your Honors, that the courts, particularly the United States Supreme Court and the federal courts, have really shifted towards arbitration. In compelling arbitration, where you have these broad-worded agreements to arbitrate. I cite these so-called gateway arbitration provision cases of the United States Supreme Court. We think that's what we have here. We have a broad-worded agreement to arbitrate. If there's a dispute about lack of funds, that's to go to the arbitrator. And I think that's what the U.S. Supreme Court was saying in these so-called gateway arbitration cases. Thank you. Thank you.